**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 23-90906** |
| **NOVVI, LLC,** | § | |
| | § | **Chapter 11** |
| **Debtor.**[1] | § | |

**DECLARATION OF JASON R. WELLS IN SUPPORT OF**
**THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Jason R. Wells, hereby submit this declaration (this "Declaration") under penalty of perjury:

1.      I am the President of Novvi, LLC ("Novvi"), a limited liability company organized under the laws of the State of Delaware and the above-captioned debtor and debtor in possession (the "Debtor"). I have served in this capacity since August 2023. Prior to becoming President, I served as Chief Technology Officer of the Debtor beginning in April 2014.

2.      I am generally familiar with the Debtor's day-to-day operations, lubricant base oil products, financial affairs, and books and records.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations, assets, and finances; information learned from my review of relevant documents; information supplied to me by other members of the Debtor's management and its advisors; or my opinion based on my experience, knowledge, and information concerning the Debtor's operations, financial condition, and the lubricant base oil industry generally.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtor.  If called upon to testify, I could and would competently testify to the facts set forth herein.

---

[1] The debtor and debtor in possession in this chapter 11 case, along with the last four digits of its Employer Identification Number, is as follows: Novvi, LLC (4744).  The Debtor's service address is: 2525 Independence Parkway South, Deer Park, Texas 77536.

3.     On December 3, 2023 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief (the "<u>Chapter 11 Case</u>") under Chapter 11, title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended and modified, the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "<u>Court</u>").  To minimize the adverse effects on the business, the Debtor has filed motions seeking various types of "first day" relief (the "<u>First Day Motions</u>") to allow the Debtor to meet its obligations and fulfill its duties as a debtor in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption or loss of productivity and value.  I further believe that the relief sought in each First Day Motion constitutes a critical element in moving towards a successful restructuring of the Debtor's financial affairs, and best serves the Debtor's estate and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.

4.     This Declaration is intended to provide an overview of the Debtor's business and its need to commence the Chapter 11 Case. Section I provides a brief overview of the Debtor's business operations. Section II describes the Debtor's prepetition capital and membership interest structure. Section III describes certain circumstances that precipitated commencement of the Chapter 11 Case and the Debtor's objectives in the Chapter 11 Case. Section IV provides a summary of the Debtor's plan to utilize the bankruptcy process.  Finally, Section V provides a summary of the First Day Motions and the factual bases supporting the relief requested therein.

## I.   <u>COMPANY OVERVIEW</u>

### A.   <u>Introduction</u>

5.     The Debtor was formed in 2011 as a joint venture between Amyris, Inc. ("<u>Amyris</u>") and Cosan US, Inc. ("<u>Cosan</u>") to develop, produce, market and sell lubricant base oils from

2

renewable feedstocks.  Presently, the Debtor's membership interests are held by four (4) entities: (i) Amyris; (ii) H&R Group US, Inc. ("H&R"); (iii) Chevron Products Company, a division of Chevron U.S.A. Inc. ("Chevron"); and (iv) American Refining Group, Inc. ("ARG"). The Debtor's board of directors consists of 7 members representing 3 of the 4 membership interest holders.

6.      The Debtor first focused its business development on the large commodity lubricants market.  However, the capital outlay to scale up operations and manufacture its base oil product called "SynNova" for the economy of scale necessary to compete in the commodities market proved to be a significant challenge.  The Debtor has continued to innovate and help customers to find high performance and niche markets where significantly higher value is derived from using SynNova in specific applications (as described in more detail below) that can support a higher product price within the Debtor's existing plant capacity.  To accomplish this pivot to higher value/lower volume markets, the Debtor's balance sheet needs to be restructured.



7.      The majority of the Debtor's manufacturing operations are located in a twenty-five (25) kiloton per year plant (the "Plant") located in La Porte, Texas staffed by thirty-seven (37) of the Debtor's employees.  While the Debtor owns the Plant and all of its equipment, the Debtor rents the land from Texas Molecular, a third-party not affiliated with the Debtor.  At the Plant, the Debtor's employees execute on the manufacturing process designed by the Debtor which includes, among other things, reacting the feedstock through multiple chemical processes to produce the product.  In addition, the Plant also provides quality control services, customer service, and logistical services.  Below is a picture of the Plant:



8.      The Debtor's headquarters is located in Alameda, California where five of the Debtor's employees work to provide many of the product development and design and technical

customer support elements of its business.  Finally, two of the Debtor's employees are located in North Carolina where the Debtor rents a small facility that was originally utilized in the production of small samples and small-scale testing of the Debtor's new products.

**B.**     **Company Background**

9.     As stated above, the Debtor was formed in 2011 as a joint venture between Amyris and Cosan to develop, produce, market and sell lubricant base oils utilizing farnesene as a feedstock.  Farnesene is a hydrocarbon produced via fermentation of sugar in a bioengineered yeast strain and was Amyris' primary product.  Amyris and Cosan each had fifty percent (50%) ownership of Novvi, with Cosan contributing $10 million in cash and Amyris contributing $10 million in intellectual property and know-how for the process technology to convert farnesene into a high-performance base oil. Farnesene was projected to cost $1/kg as production scaled up and improvements were made to the yeast strain and the downstream process.  The Debtor's base oil product, "Novaspec," used a combination of farnesene and petroleum derived linear olefins as monomers to create lubricant base oils to meet high performance requirements in the commodity lubricants space.   Ultimately, Amyris was unable to bring the cost of farnesene below $3/kg, leading the Debtor to look for alternative feeds.

10.     Between 2016 and 2018, ARG, H&R and Chevron invested in the Debtor to fund research and development and capital improvements, including expanding operations at the Debtor's Plant.   At this initial stage, ARG, H&R, and Chevron each contributed $10 million and held membership interests equal to the membership interests of Amyris and Cosan.  Not all members continued to participate in future funding rounds, and as a result, to the Debtor's knowledge as of the Petition Date, certain investors hold a higher percentage of the Debtor's membership interests as detailed below.

4864-8727-6945, v. 8

| Company | Equity Invested | Interests Owned | Ownership % |
|---|---|---|---|
| Amyris | $ 21,980,273 | 372,437 | 16.1% |
| Cosan | $ 17,746,259 | — | 0.0% |
| ARG | $ 10,110,000 | 139,891 | 6.1% |
| Chevron | $ 62,658,637 | 1,533,024 | 66.5% |
| H&R | $ 15,132,904 | 260,793 | 11.3% |
| **Total** | **$ 127,628,073** | **2,306,145** | **100.0%** |

11.     During this period, the Debtor developed SynNova, a cutting-edge 100% renewable base oil that does not utilize farnesene and is made using feedstocks derived from plant oils which yields a higher performance than the Debtor's first generation of product.  The summary below best describes the Debtor's current market position and the applications for which its high-performing SynNova will be used:



12.     Customers in the market spaces identified above often approach the Debtor when looking for a low carbon footprint alternative to petroleum-based oils due to both customer demand

and regulatory pressures for businesses to measure and improve their carbon footprint. The Debtor's customers have discovered further value in their markets upon product development and testing that derives from the uniquely designed chemical structure and high purity of SynNova when compared to the petroleum oils they were looking to replace. While this switch from "drop-in replacement" to finding a unique value proposition and certification of new formulations is a longer process for the customer, these areas where the customer derives both a performance benefit and a differentiated product alongside the reduced carbon footprint are where the Debtor has found a good product fit.

## II.    PREPETITION CAPITAL STRUCTURE

13.    As of the Petition Date, the Debtor had approximately $26,850,000 in aggregate debt outstanding under its prepetition credit facilities. The following chart summarizes the Debtor's funded debt obligations as of the Petition Date.

| Debt Facility | Approximate Amount Outstanding | |
|---|---|---|
| H&R Non-Revolving Senior Secured Convertible Note | Tranche A: | $887,420 |
| | Tranche B: | $1,012,580 |
| Chevron Non-Revolving Secured Convertible Note | $15,000,000 | |
| Pre-Petition Priming Facility | $9,950,000 | |
| **Total** | **$26,850,000** | |

## A.    The H&R Non-Revolving Secured Convertible Note

14.    On or around July 1, 2022, the Debtor entered into the H&R Non-Revolving Senior Secured Convertible dated July 1, 2022 (the "H&R Note") providing (i) Tranche A debt in the principal amount of $887,420, advanced pursuant to the H&R Note and (ii) Tranche B debt in the total principal amount of $1,012,580 which consists of (a) $500,000 in principal advanced to the

7

Debtor on September 1, 2023, and (b) $512,580 in principal advanced to the Debtor on October 2, 2023 (collectively, the "Existing Debt Advances").

**B.      Pre-Petition Priming Facility**

15.      Additionally, the Debtor entered into that certain Non-Revolving Senior Secured Note dated November 6, 2023, between the Debtor and H&R in the principal amount of up to $10 million (the "Priming Facility" and together with the Existing Debt Advances, the "H&R Prepetition Debt"). The Priming Facility is secured by substantially all of the assets of the Company and perfected by the filing of a UCC-1 financing statement on November 7, 2023 with the Delaware Department of State. The Pre-Petition Priming Facility has a first priority interest over both the H&R Non-Revolving Secured Convertible Note and the Chevron Non-Revolving Secured Convertible Note. The principal balance on the Priming Facility as of the Petition Date is $9,950,000.

**C.      The Chevron Non-Revolving Secured Convertible Note**

16.      The Debtor also entered into the Chevron Non-Revolving Secured Convertible Note dated July 1, 2022 (the "Chevron Note"). The Chevron Note has an outstanding balance of $15,000,000 in principle plus interest, fees, expenses and costs to Chevron (the "Chevron Prepetition Debt" and together with the H&R Prepetition Debt, the "Prepetition Debt"). The Chevron Prepetition Debt is secured by a security interest as set forth in the security agreement executed therewith. The Chevron Note is secured by substantially all assets of the Debtor and perfected by the filing of a UCC-1 on October 3, 2023, with the Delaware Secretary of State.[2]

---

[2] The H&R Non-Revolving Secured Convertible Note and the Chevron Non-Revolving Secured Convertible Note are in *pari passu*.

4864-8727-6945, v. 8

**D.** **General Unsecured Vendor Debt**

17.     In addition to its prepetition credit facilities, the Debtor has approximately $2.85 million in unsecured trade debt as of the Petition Date incurred in the ordinary course of business.

### III.     EVENTS LEADING TO CHAPTER 11 CASE

**A.** **The Debtor's Product, the Commodity Market, and Difficulty Scaling**

18.     The primary challenges facing the Debtor are its debt accumulation and significant operational losses which ultimately stem from both the Debtor's inability to utilize the Plant to its full capacity (<10%) and its inability to compete in the large but low-value commodity lubricants markets.  For the Debtor to compete in the low-value commodity lubricants market, it would likely require: (i) vertical integration with a feedstock source, (ii) a one hundred (100) kiloton per year plant (the "New Plant") to obtain economy of scale; and (iii) a capital investment of approximately $400-500 million.   The Debtor, however, could not secure this funding before achieving profitability.

19.     To back the New Plant, the Debtor needed substantial orders in large markets, leading to discounting the product to compete in commodity base oil markets and a shift away from business development in smaller high-value markets. The mature and slow-moving nature of the commodity lubricants market, with extensive testing and validation requirements, added further challenges to the product adoption timeline.

20.     Operating the current Plant under ten percent (10%) capacity made cost-cutting measures insufficient to acheive breakeven or profitability.  Consequently, the Debtor faced a depletion of working capital while attempting to secure funds for the New Plant project.

21.     Despite the financial difficulty experienced by the Debtor in quickly scaling its business, the Debtor, Chevron and H&R believe that the Debtor can effectively restructure its

9

business and its balance sheet.  To do so, the Debtor must right-size its operations to compete in niche, high-performance markets.  The Debtor's target market segments, which derive true value from the product, are currently able to support positive margin sales.

**B.**     **Prepetition Negotiations and Entry into the Restructuring Support Agreement**

22.     From August 15 to 18, 2023, the Debtor and H&R met for a three-day collaborative effort involving the Debtor's technical, operations, commercial, and marketing teams.  These meetings were spent reviewing the Debtor's cost of production, pricing and sales history and systematically reviewing all current customers and markets.  Together, the Debtor and H&R were able to develop a strategy and a turn-around plan that could be executed within the next three years and would reach profitability while utilizing a finite amount of new capital.   This model has been continuously refined and validated since then with the additional benefit of weekly reviews of the turnaround business plan and bottom-up sales plan in conjunction with business and financial managers from H&R.

23.     Upon developing this new business plan, the Debtor, Chevron, and H&R began negotiating a restructuring support agreement (the "RSA").  The RSA, a copy of which is attached to this Declaration as **Exhibit A**, provides for a balance sheet reorganization where only the Prepetition Debt, the equity interests and the related phantom equity awards are affected.  This represents a significant deleveraging of the Debtor.  The end-result of this restructuring is a significantly deleveraged company better able to compete in the niche high performance lubricants market.  Due to significant investment and the debt for equity swap, Allowed General Unsecured Claimants such as vendors and other creditors are contemplated to be paid in full under the Debtor's proposed restructuring plan.

## IV.     CHAPTER 11 RESTRUCTURING

24.     The Debtor commenced the Chapter 11 Case to restructure its balance sheet pursuant to the Combined Chapter 11 Plan of Reorganization and Disclosure Statement (the "Plan").  The Debtor intends to file the Plan promptly after the filing of the Chapter 11 Case.

25.     Through the Plan, the Debtor intends to utilize the chapter 11 process to (i) restructure membership interests, (ii) restructure its Prepetition Debt and, (iii) enable new capital to fund a turnaround strategy. A restructuring of the Debtor's balance sheet is necessary in order for the Debtor to be able to meet its financial obligations in the long term and successfully pivot into a higher value lubricant market.  This balance sheet restructuring would be effectuated, in simple terms, by H&R and Chevron converting their debt into equity with H&R providing additional capital.

26.     Critically, because the principal objective of the Plan is to address the outstanding funded secured debt of the Debtor, only such debt claims are impaired under the Plan.  All other claims, including all general unsecured claims are unimpaired.

27.      The business plan leverages existing assets and opportunities by transitioning from a high-volume commodity lubricants approach to a specialty high-value focus in current or adjacent markets. This strategic shift aims to enable positive-margin sales and attain profitability within the current plant footprint with approximately $25 million in new financing.[3] The core strategy comprises three elements:

28.     Price Optimization:  The Debtor previously discounted its products in an attempt to support rapid growth for the commodity lubricants business model and underpin a large capital

---

[3] Of this projected $25 million, $16 million is being contributed by H&R in the form of debtor in possession financing.

expansion.  The Debtor has learned that most of its non-finished lubricants base oil customers are willing to accept higher prices at current volumes if the Debtor does not try to 'push volume' and becomes a more reliable, responsive supplier and effectively communicates the basis for price increases.  The Debtor has existing margin-positive sales to customers who have found value from the unique properties of SynNova as opposed to using it as a drop-in replacement for an existing commodity base oil.  Additionally, the business plan recognizes the potential for higher prices by helping customers properly position their products as top-tier in performance, formulating beyond minimum specifications, measuring efficiency benefits and marketing those benefits so that their value is captured.

29.     <u>Specialty Chemical Opportunities</u>:  The Debtor has identified immediate opportunities to enhance the value of its portfolio by targeting high-margin specialty applications which have been previously validated but given insufficient business resources due to their smaller volumes. These specialty products, designed to serve unmet needs in growing or niche markets, have demonstrated their potential for substantial sales, as exemplified by collaborations in personal care, polymers, phase change materials and ecolabel high-performance industrial lubricants, all at significantly higher average selling prices (ASPs).  Additionally, new markets and applications have been developed over the past several years in immersion cooling and EV driveline fluids which value the Debtor's technology and performance and will have higher margins than conventional lubricant applications.  These high-margin segments were not previously a focus due to their low initial purchase volumes or smaller markets, which did not align with the previous CEO's focus on the large commodity oil business model.

30.     <u>Operational Improvements</u>:  The Debtor has pinpointed opportunities to enhance the current plant's efficiency and yield through cost-effective capital expenditure projects. These

projects were reviewed and endorsed by the Debtor's operations council, a steering committee with representatives from Chevron, H&R, and Amyris. Despite previously being unfunded due to a focus on the 100KT Plant, implementing these initiatives now will give immediate enhancements in unit economics and gross margins generating a positive ROI within a few months of production. These operational improvements include optimizing the distillation column for separation efficiency to increase yields, implementing a heat exchanger to reduce energy usage, which will not only bring down the cost but also the manufacturing emissions of the product, which is a benefit to both the Debtor and its customers.

## V.   FIRST DAY MOTIONS

31.     Below is an overview of certain First Day Motions which remain pending as of the filing of this Declaration. The First Day Motions seek relief intended to facilitate a smooth transition for the Debtor into the Chapter 11 Case and minimize disruptions to the Debtor's business operations. Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motion.

**A.     Debtor's Emergency Application for an Order Authorizing the Employment and Retention of Donlin, Recano & Company, Inc. as Claims and Noticing Agent for the Debtor (the "Donlin Application")**

32.     Pursuant to the Donlin Retention Application, the Debtor seeks entry of an order appointing Donlin, Recano & Company, Inc ("DRC") as claims and noticing agent in this Chapter 11 Case subject to the terms of the engagement agreement attached to the Donlin Application. I believe that DRC is well-qualified to perform the services contemplated by the Donlin Application, that the services to be performed by DRC are necessary for the successful administration of this Chapter 11 Case, and that DRC will coordinate their services with the Debtor's other professionals to avoid duplication of efforts and expense.

**B.     Debtor's Emergency Motion for Entry of an Order (A) Approving Form and Manner of Notice of Commencement, (B) Setting General Claims Bar Date for Filing Proofs of Claim, and (C) Redaction of Certain Personal Information of Individual Employees and Customer Information (the "<u>Commencement and Bar Date Motion</u>")**

33.     In the Commencement and Bar Date Motion, the Debtor seeks entry of an order (a) approving the form and manner of notifying creditors of the commencement of the Chapter 11 Case and other information, (b) setting the general claims bar date, and (c) redact certain personal identification information of the Debtor's individual employees and confidential customer information.

34.     The Debtor is seeking entry of an order approving the notice of commencement (the "<u>Notice of Commencement</u>") and the manner in which it is served.  The Debtor proposes to have its claims and noticing agent, DRC serve the Notice of Commencement of the Chapter 11 Case to (a) all parties entitled to notice as listed on the list of creditors required to be filed with the Court pursuant to Bankruptcy Rule 1007 (the "<u>Creditor Matrix</u>"); (b) the Office of the United States Trustee for the Southern District of Texas (the "<u>U.S. Trustee</u>"); (c) the Debtor and its counsel, (d) the holders of the thirty (30) largest unsecured claims against the Debtor; (e)  H&R and its counsel, (f) Chevron and its counsel, (g) the United States Attorney's Office for the Southern District of Texas; (h) those persons who have formally appeared in the Chapter 11 Case and requested service pursuant to Bankruptcy Rule 2002; (i) all applicable government agencies to the extent required by the Bankruptcy Rules and the Bankruptcy Local Rules; and (j) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

35.     Also, the Debtor seeks to implement a process that shortens the applicable bar dates for certain parties in interest to assert claims against the estate in order to fully evaluate the universe of potential claims.  As detailed therein, the relief requested in the Commencement and Bar Date

14

Motion includes, among other things, the establishment of a general claims bar date of January 12, 2024 (the "General Claims Bar Date") as the last date and time for any entity to file proofs of claim (a "Proof of Claim") against the Debtor based on prepetition claims.  I believe that the relief requested in the Commencement and Bar Date Motion is critical because it will afford the Debtor an opportunity to analyze the universe of Proofs of Claim asserted against the estate in a timely fashion.  Moreover, understanding the universe of claims against the Debtor will aid in the Debtor's budgeting and forecasting as it seeks to quickly and efficiently exit the Chapter 11 Case in accordance with its Plan.

36.     Cause exists to redact the address information of the Debtor's individual employees from the Creditor Matrix.  In particular, such information could potentially be used to perpetrate identity theft of the Debtor's individual employees who may not want their information disclosed in public filings.  I have been advised and come to understand that the Bankruptcy Code grants the Court discretion to protect individuals from the disclosure of such information, and I believe that such relief is appropriate under the circumstances and will not prejudice any party in interest. Indeed, the Debtor still proposes to provide, upon request, unredacted versions of the Creditor Matrix to the Court, the U.S. Trustee, and counsel to any official committee appointed in the Chapter 11 Case.

37.     Additionally, the Debtor seeks to redact the confidential information of its customers.  Such information, if revealed, risks the Debtor's relationship with the client and exposes the Debtor to outside forces that might seek to poach the Debtor's customers for their own benefit.  The Debtor has worked tirelessly to maintain its customer base through its pivot to the high-value lubricants market and any disruption will significantly hinder the future prospects of the Debtor.

**C.      Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Pay Prepetition Wages to Employees and (II) Granting Related Relief (the "<u>Employee Wage Motion</u>")**

38.      In the Employee Wage Motion, the Debtor requests entry of an order: (i) authorizing, but not directing, the Debtor to (a) pay, in its sole discretion, all obligations incurred under or related to wages, salaries, other compensation, reimbursable expenses, and payroll service fees (collectively, the "<u>Employee Obligations</u>") and all costs related to the foregoing, and (b) maintain and continue to honor their practices, programs, and policies in place for the Employees, as such may be modified, amended, or supplemented from time to time in the ordinary course of business; and (ii) authorizing and directing the Debtor's Banks, including JP Morgan Chase, N.A. to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to the Employee Obligations.

39.      As set forth in the Employee Wage Motion, the Debtor has approximately forty-four (44) full-time and part-time employees (collectively, the "<u>Employees</u>").  The types of Employees include officers, administrative staff, operational staff, sales and client account managers, engineers, operators, lab technicians, and other manufacturing support staff.  Except for the Employees who work remotely, each of the Employees work at the Debtor's offices located in Alameda, California, or facilities located in North Carolina and La Porte, Texas.  These Employees are vital to maintaining the value of the Debtor's estate as it transitions into the Chapter 11 Case.  The vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, Employees would be exposed to significant financial hardship if the Debtor was not permitted to continue paying their compensation, providing benefits, and maintain existing programs.

4864-8727-6945, v. 8

40.     The Debtor utilizes the services of a professional employment organization, AlphaStaff, Inc. ("AlphaStaff"), to process payroll, and employee benefit plans are administered through FUSE by AlphaStaff.  The Debtor submits a net amount of money to AlphaStaff prior to the conclusion of each pay period, who then administers all of the Debtor's obligations incurred or related to wages, salaries, payroll taxes, and payroll service fees.  Salaried employees are paid semi-monthly and hourly employees are paid weekly via direct deposit from AlphaStaff. The Debtor's description of the payroll process and the amounts and other Employee Obligations due to the Employees as set forth in the Employee Wage Motion is accurate.

41.     I believe that the relief requested in the Employee Wage Motion is in the best interests of the Debtor's estate and will enable the Debtor to continue to operate its business in the Chapter 11 Case without disruption so as to avoid immediate and irreparable harm to the estate. Accordingly, I believe the Court should grant the relief requested in the Employee Wage Motion and authorize the Debtor to honor the Employee Obligations, including those incurred prior to the Petition Date, and pay the Employees during the Chapter 11 Case.

**D.     Debtor's Emergency Motion for Entry of an Order (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief (the "Utilities Motion")**

42.     Pursuant to the Utilities Motion, the Debtor seeks entry of an order: (i) approving the Debtor's proposed adequate assurance of payment for future utility services; (ii) prohibiting utility companies from altering, refusing, or discontinuing services; and (iii) establishing procedures for determining adequate assurance of payment and resolving adequate assurance requests.

43.      In connection with the operation of its business and management of its assets, the Debtor obtains Utility Services from a number of Utility Providers.  Several of the Utility Providers provide services through accounts with the Debtor's landlords. The Landlords invoice the Debtor for the monthly utilities. A nonexclusive list of the Utility Providers that provide Utility Services to the Debtor as of the Petition Date (the "Utilities Service List") is attached as an exhibit to the Utilities Motion.

44.      The Debtor spends an aggregate amount of approximately $41,297.44 per month on Utility Services from the Utility Providers. Most, if not all, of the Debtor's Utility Providers do not hold any deposits from the Debtor.  As of the Petition Date, the Debtor current on its obligations to Utility Providers on account of prepetition Utility Services. To the best of the Debtor's knowledge, there were no defaults or arrearages with respect to the undisputed invoices for prepetition Utility Services.

45.      The uninterrupted continuation of the Utility Services is critical to the Debtor's ongoing business operations throughout the course of the Chapter 11 Case.  Should any of the Utility Providers refuse or discontinue service, even for a brief period, the Debtor's business operation and primary revenue source would be jeopardized.  Accordingly, I believe the Utilities Motion should be approved by the Court.

**E.     Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to Pay or Honor Prepetition Obligations to Certain Critical Vendors, and (II) Authorizing Banks to Honor All Related Checks and Electronic Payment Requests (the "Critical Vendor Motion").**

46.      Pursuant to the Critical Vendor Motion, the Debtor seeks entry of a final order (i) authorizing, but not directing, payment to Critical Vendors (ii) authorizing and directing Banks to

receive, process, honor, and pay all checks and electronic payment requests made by the Debtors related to such obligations; and (iii) granting related relief.

47.     The Debtor owes certain third-party vendors for amounts owed prepetition.  The Debtor has identified Critical Vendors by using a set of criteria that focuses, among other things, on whether a vendor could assert a lien, whether a vendor is essential to the continued operation of the Debtor's business, and whether a vendor is likely to continue doing business with the Debtor notwithstanding nonpayment of prepetition claims. Specifically, the Debtor's Critical Vendors provide products and services uniquely tailored to the Debtor's business of manufacturing industrial grade high performing lubricants.  Identifying replacement vendors would be exceedingly difficult, especially given the proposed short duration of this Chapter 11 Case. Moreover, the Debtor relies on timely performance by Critical Vendors, and any interruption – however brief – would disrupt the Debtor's operations and could potentially cause material harm to its business.  Such harm would likely far outweigh the cost of the payment to Critical Vendors.

48.     In sum, I believe that payment by the Debtor, in its sole discretion, of each of the payments to Critical Vendors is critical to protect the Debtor's business operations during the pendency of this Chapter 11 Case. I believe that (i) changes in providers are not necessary or appropriate given a limited timeframe for the Debtor to confirm a plan of reorganization in this Chapter 11 Case; (ii) the harm and disruption that would occur far outweighs the amounts being paid; and (iii) all allowed general unsecured creditors, regardless of their Critical Vendor status, will be paid in full under the proposed Plan  As a result, I believe payment to Critical Vendors is in the best interests of the Debtor, its estate, creditors, and all parties in interest.

**F.     Debtor's Emergency Motion for Entry of an Order Authorizing Continued Use of Prepetition Bank Accounts, Cash Management System, Forms, and Books and Records (the "<u>Cash Management Motion</u>")**

49.     Pursuant to the Cash Management Motion, the Debtor seeks entry of an order authorizing the Debtor to: (a) continue to operate its cash management system and maintain its existing bank accounts, including honoring certain prepetition obligations related thereto; (b) maintain existing business forms; (c) continue the performance its business transactions consistent with the Debtor's historical practices; and (d) waiving the guidelines (the "<u>Guidelines</u>") established by the U.S. Trustee related to cash management systems.

50.     In the ordinary course of business, the Debtor uses and maintains certain pre-printed correspondence and business forms, including, but not limited to, letterhead, envelopes, promotional materials and other business forms related to its lubricant base oil operations and assets (collectively, the "<u>Business Forms</u>").  Adopting a new set of Business Forms would create unnecessary administrative burdens and hardship and would cause unnecessary expense, use of resources, and delay.  To minimize the administrative interruptions and expenses, the Debtor requests authority to continue to use its Business Forms substantially in the form existing immediately prior to the Petition Date, without reference to the Debtor's status as "Debtor in Possession" in the Chapter 11 Case as required by the U.S. Trustee Guidelines.

51.     The Debtor also maintains a cash management system (the "<u>Cash Management System</u>") in the ordinary course of business to gather, allocate, transfer, and disburse funds with respect to its operations and to facilitate cash monitoring and reporting.  The Cash Management System is comprised of just one active bank account (the "<u>Account</u>") at JP Morgan Chase, N.A. ("<u>JP Morgan Chase</u>").  JP Morgan Chase is an authorized depository pursuant to the U.S. Trustee Guidelines. As currently established, the Debtor's existing Account and Cash Management System

function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtor and all parties in interest.

52.     Given the nature of the Debtor's business, the uninterrupted use of the Debtor's Account is vital to its operations and overall Cash Management System and will facilitate the Debtor's transition into the Chapter 11 Case by minimizing delays in paying post-petition debtors and eliminating administrative inefficiencies. Moreover, maintaining the current Cash Management System will allow the Debtor's limited workforce to attend to their daily responsibilities rather than organize and administer a new system.  Requiring the Debtor to adopt a new cash management system in the Chapter 11 Case would be costly, burdensome, and disruptive to operations at this critical juncture, and could have a negative effect on the Debtor's ongoing restructuring efforts.

53.     Finally, the Debtor seeks a waiver of the Guidelines established by the U.S. Trustee requiring that Chapter 11 debtors in possession, among other things: (i) close all existing bank accounts and open new debtor in possession bank accounts; (ii) establish separate bank accounts for operations, payment of taxes, and cash collateral; and (iii) obtain new checks bearing the designation "Debtor in Possession," along with additional information.

54.     I believe that compliance with these requirements would create substantial and unnecessary administrative burdens, including additional expense, confusion among creditors, and diversion of scarce resources to the detriment of the Debtor as it transitions into the Chapter 11 Case.  On the other hand, permitting the Debtor to maintain its existing Account and Cash Management System will prevent the disruption of operations and will not prejudice any party in interest, especially in light of the speed in which the Debtor plans to exit this Chapter 11 Case. Further, because the Debtor presently maintains sophisticated, computerized accounting and

4864-8727-6945, v. 8

record keeping systems related to the Account, the Debtor will be able to ensure that all prepetition and post-petition transactions are properly accounted for and easily distinguished. The Debtor intends to continue its practice of maintaining complete and accurate records of all transfers of funds in and out of the Account. I therefore believe a waiver of the U.S. Trustee Guidelines is appropriate, as set forth in the Cash Management Motion.

**G.    Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting related Relief (the "DIP Motion")**

55.    The DIP Motion is critical to the Debtor's success in this Chapter 11 Case, and without the Court granting the relief requested in the DIP Motion, each of the foregoing First Day Motions would be rendered moot. Pursuant to the DIP Motion, the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to obtain post-petition financing on a senior secured super-priority priming debtor in possession credit facility in an aggregate principal amount not to exceed $16,000,000 which shall be comprised of: of: (i) $6,000,000 of new money (the "H&R DIP New Money Term Financing") and (ii) a roll-up term loan which shall refinance an equivalent amount of certain H&R Prepetition Obligations (as defined in the DIP Motion), which roll-up shall apply solely to the Priming Facility and Tranche B of the Existing Debt Advances (as defined below) held by the H&R DIP Lender (in its capacity as Prepetition Lender), in the aggregate principal amount of up to $10,000,000 (the "H&R DIP Term Refinancing", and together with the H&R DIP New Money Term Financing, the "H&R DIP Loans").

56.    Further, the DIP Motion seeks to grant H&R Group US, Inc. ("H&R DIP Lender") superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions

of the Bankruptcy Code, (the "Superpriority H&R DIP Claims"), subject only to the Carve-Out (as defined in the Motion).

57.     Additionally, the Debtor seeks authorization to use cash collateral ("Cash Collateral") of both H&R DIP Lender and Chevron.  As noted in the DIP Motion, the Debtor has an urgent need for significant and immediate liquidity.  Specifically, without immediate financing and authority to use Cash Collateral, the Debtor projects that it will be unable to make payments essential to continued going concern operations, resulting in immediate and irreparable harm to the Debtor's business.  As a result, the proposed H&R DIP Loans are critical to the Debtor's ability to administer this Chapter 11 Case and pursue the restructuring contemplated by the RSA and the Debtor's Plan.

58.     Use of Cash Collateral and the H&R DIP New Money Term Financing will provide working capital in the operation of the Debtor's business for the purposes specified in, and at least for the period defined in, the budget (the "Approved Budget") which is attached to the DIP Motion. Specifically, the Debtor requests that the Court enter an order on an interim basis (the "Interim Order") authorizing the incurrence of the H&R DIP Loans and use of Cash Collateral in accordance with the Approved Budget, providing adequate protection for, and to the extent of, any diminution in value of the Cash Collateral, and scheduling a hearing (the "Final Hearing") for the Court to consider entry of an order approving the relief requested in the DIP Motion on a final basis (the "Final Order").

59.     The use of the H&R DIP Loans and Cash Collateral will ensure that the Debtor has continued financing to continue to operate in this Chapter 11 Case.  Specifically, the Debtor requires the use of the H&R DIP Loans and use of Cash Collateral to make payments to, *inter alia*, the Employees, Utility Providers, Critical Vendors, and other interested parties for purposes of

conducting its operations and paying related expenses.  Any failure to make those payments could cause substantial uncertainty and disruption to the Debtor's business.

60.     Based on the analysis conducted by the Debtor, the Debtor is unable to generate enough cash from operations in the ordinary course of business to cover its working capital needs in addition to the projected costs of this Chapter 11 Case.  Therefore, the Debtor will have insufficient cash in the initial weeks of this Chapter 11 Case absent the incurrence of the H&R DIP Loans and the authority to use Cash Collateral pursuant to the Interim Order and any Final Order entered by the Court.  Authorizing the incurrence of the H&R DIP Loans along with the use of Cash Collateral will send a positive, credible message to the Debtor's commercial counterparties and other parties in interest that the Debtor will be able to meet its ordinary course obligations and operate in this Chapter 11 Case as it moves forward with its restructuring efforts.

61.     Prior to the commencement of this Chapter 11 Case, the Debtor, H&R, and Chevron engaged in discussions to structure and achieve consensus on a balance sheet restructuring while ensuring the Debtor maintained liquidity to operate its business in the ordinary course.  These efforts resulted in the Debtor, H&R, and Chevron entering into the RSA.  I believe that the principal economic terms proposed under the H&R DIP Loans are uniquely favorable to the Debtor and reflect the particular circumstances of this Chapter 11 Case.  Specifically, the H&R DIP Loans – along with the Prepetition Debt – upon the effective date of the Plan, if confirmed, will be converted to membership interests rather than required to be paid in cash.  I do not believe that the Debtor could obtain other financing on terms that would alleviate the Debtor's obligation to pay back such financing.

62.     I believe that the proposed H&R DIP Loans are the Debtor's best source of post-petition funding under the circumstances.  The negotiations around the proposed H&R DIP Loans

24

extended for over two (2) months with all parties represented by separate counsel.  In my view, these negotiations were conducted at arm's length and in good faith.

63.    I believe the Debtor will face substantial and irreparable harm without the relief requested in the DIP Motion.  Accordingly, I believe the Court should grant the relief requested in the DIP Motion and enter the Interim Order, and after the conclusion of the Final Hearing, the Final Order, authorizing the Debtor (i) to incur the H&R DIP Loans and (ii) to use Cash Collateral in accordance with the Approved Budget.

Signed on this the 3rd day of December 2023.

By:    /s/ *Jason R. Wells*
       Jason R. Wells
       President
       Novvi, LLC

25